IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PAUL F. KENDALL                    *
                                   *
        v.                         *      Civil No. JFM-09-660
                                   *
HOWARD COUNTY MARYLAND,            *
ET AL.                             *
                                 *****

MEMORANDUM

This action arises from a decision by the Howard County Board of Elections ("HCBE")

on March 12, 2009 to reverse its previous decision to grant certification to Howard County

Citizens for Open Government ("HCCOG") that it had met or exceeded the initial threshold of

obtaining the 2,500 signatures necessary to petition to referendum an action of the Howard

County Council (Council Bill 58).  Plaintiff, Paul F. Kendall ("Kendall" or "Plaintiff"), who

signed HCCOG's petition for referendum, has filed suit against Defendants Howard County,

Maryland ("Howard County"); Ann M. Balcerzak ("Balcerzak"); Betty L. Nordaas ("Nordaas");

Robert L. Walker ("Walker"); and Linda H. Lamone ("Lamone") (collectively, "Defendants")

under 42 U.S.C. § 1983, charging Defendants with violating his First and Fourteenth

Amendment rights.  Balcerzak and Nordaas are officials of the Howard County Board of

Elections ("HCBE").  Walker and Lamone are officials of the Maryland State Board of Elections

("MSBE").  All individual defendants have been sued in their official capacities.  (1st Am.

Compl. ¶¶ 5-8.)  Plaintiff claims declaratory and injunctive relief, costs, and fees.  (*Id.* at 21.)

Pending before this Court are Defendants Balcerzak and Nordaas's Motion to Dismiss

(Dkt. No. 13), and Defendant Howard County's Motion to Dismiss (Dkt. No. 10).  The motions

will be granted.  Moreover, the claims against Walker and Lamone will also be dismissed.

Although they have filed answers, their answers include the defense that plaintiffs have failed to

1

state a claim upon which relief can be granted and, for the reasons stated in this Memorandum, I

find that defense to be meritorious.

I.

On November 3, 2008, the Howard County Council passed Council Bill 58 ("CB-58").

(1st Am. Compl. ¶ 10.)  On November 17, 2008, HCCOG filed a request for an advanced

determination from HCBE as to the sufficiency of a petition to take CB-58 to referendum (*id.* ¶

13); that request was subsequently approved on December 1, 2008.  (*Id.* ¶ 14.)  Section 211 of

the Howard County Charter ("Charter") provides, in relevant part:

> (a) Scope of the referendum
> The people of Howard County reserve to themselves the power known as "The Referendum," by petition to have submitted to the registered voters of the County to approve or reject at the polls, any law or part of any law of the Council.  The referendum petition . . . shall be sufficient if signed by five per centum of the registered voters of the County, but in any case not less than 1,500 or more than 5,000 signatures shall be required.  Such petition shall be filed with the Board of Supervisors of Election of Howard County within sixty days after the law is enacted. . . . [I]f more than one-half, but less than the full number of signatures required to complete any referendum petition against such law be filed within sixty days from the date it is enacted, the time for the law to take effect and the time for filing the remainder of signatures to complete the petition shall be extended for an additional thirty days.

Howard County, Md., Charter § 211 (2008).

In Howard County, the signatures of 5,000 registered voters are needed to refer a

legislative act of the County Council to referendum (1st Am. Compl. ¶ 12); in this case, the

deadline for gathering a minimum of 2,500 signatures in order to secure an extension of thirty

days was January 3, 2009.  (*Id.* ¶ 17.)

By December 30, 2008, HCCOG presented to HCBE 3,301 signatures; of those, 2,603

signatures were validated and certified by HCBE on January 22, 2009, and HCCOG was given

an extension of an additional thirty days, or until February 4, 2009, to finish collecting the

requisite 5,000 signatures.  (*Id.* ¶¶ 18-19.)  On February 3, 2009, HCCOG presented HCBE with

an additional 6,079 signatures.  (*Id.* ¶ 20.)  On February 12, 2009, HCBE issued a letter stating

that it had stopped the process of verifying the additional signatures due to a pending legal

challenge filed February 4, 2009 by a third party, not participating in the signature gathering

effort.  (*Id.* ¶ 21.)  The legal challenge had nothing to do with the method by which the Board of

Elections was validating petition signatures.  (*Id.*)  On March 11, 2009, an e-mail was sent to

"several persons involved in the referendum process" stating that "the Board of Elections desires

you to be present tomorrow evening at 5:30 PM at its meeting."  (*Id.* ¶ 22; *id.*, Ex. G.)

At the March 12, 2009 meeting, HCBE President Balcerzak announced that HCBE was

reversing its January 22, 2009 decision certifying the first 2,603 signatures of HCCOG's petition.

(*Id.* ¶ 22.)  Balcerzak indicated that based on the Maryland Court of Appeals decision in *Doe v.*

*Montgomery County Bd. of Elections*, 962 A.2d 342 (Md. 2008), decided December 19, 2008,

HCBE reviewed the initial signatures and determined that under the standard set forth in *Doe*, the

initial threshold of 2,500 valid signatures had not been met and that therefore the extension for

submitting additional signatures had not been warranted.  (*Id.*)  As Nordaas explained in the final

determination letter to HCCOG's counsel[1] dated March 12, 2009:

> [T]he Board of Elections found, after review of each signature on submitted local
> referendum petitions, that it did not validate each signature in accordance with the
> mandate set forth in *Doe* which requires an individual *to sign his/her name as it*
> *appears on the statewide voter registration or place his/her surname of*
> *registration and at least one full given name and the initials of any other names*.

(*Id.*, Ex. H (emphasis in original).)  Nordaas stated that HCBE's decision to re-verify the

signatures in HCCOG's petition was based on March 11, 2009 advice from the Attorney

---

[1]      It is Defendants who identify the recipients of the letter as "counsel for HCCOG." (Mem.
of Fact and Law in Supp. of Defs.' Balcerzak and Nordaas' Mot. to Dismiss 1st Am. Compl.
["B&N's Mem."] 6-7.)

General's office.  (*Id.*, Ex. H.)

In Count I of the First Amended Complaint, Plaintiff claims that the actions of Defendants "in interpreting the signature requirements as they did," totally and completely disenfranchised Plaintiff and over 9,300 other signatories of the petition as well as the entire Howard County electorate of their right to take CB-58 to referendum and vote.  Plaintiff claims that Defendants violated his (a) "First Amendment right to express his beliefs by vote, to associate as these rights are made applicable to Howard County by the Fourteenth Amendment to the United States Constitution"; (b) "right to substantive due process and equal protection as established by the Fourteenth Amendment to the United States Constitution . . ."; and (c) "right to petition the government for redress of grievances as protected under the First and Fourteenth Amendments to the United States Constitution."  (*Id.* ¶ 34.)  Plaintiff further claims that the requirement that signatures on a referendum petition match exactly the names as written on the voter registration card is "overbroad" and represents an unreasonable burden on Plaintiff's rights to vote, petition, associate, and engage in politically protected speech.  (*Id.* ¶ 44.)

In Count II, Plaintiff claims that he was denied equal protection and procedural and substantive due process.  Specifically, Plaintiff argues that the procedural due process offered by HCBE was "insufficient" in that no notice was given of the reversal of HCBE's decision and there was no ability to challenge that decision before it took effect.  (*Id.* ¶ 53.)  Plaintiff's substantive due process argument appears to be that the process was "unfair" in that it applied "an unconstitutional law and a non-precedential portion of a Court of Appeals decision to achieve a manifestly unfair result" which denied Plaintiff his First and Fourteenth Amendment

rights.[2]  (*Id.* ¶ 54.)

## II.

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss for "failure to state a claim upon which relief can be granted."  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must state sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, --- U.S. ----, ----, 129 S. Ct. 1937, 1949 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the plaintiff pleads factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Where the well-pleaded facts of the complaint do not permit the court to infer "more than the mere possibility of misconduct," the complaint has not shown that the plaintiff is entitled to relief.  *Id.* at 1950.  The court should assume the veracity of well-pleaded allegations and then determine whether they "plausibly give rise to an entitlement to relief."  *Id.*

### III. Defendants' Balcerzak and Nordaas's Motion to Dismiss

Section 1983 is not "a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979).  In order to state a claim under Section 1983, Plaintiff must establish two elements: (1) that Defendants "deprived [him] of a right secured by the Constitution and laws of the United States;" and (2) that they "deprived [him] of this constitutional right under color of [State] statute, ordinance, regulation, custom, or usage."  *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001) (citation omitted).

---

[2]     Count III ("Violations of Constitutional Rights Protected Under 42 U.S.C. § 1983") appears to be nothing more than Plaintiff's rearticulation of the alleged violations of his First and Fourteenth Amendment rights, so I do not address it separately.

Balcerzak and Nordaas (sometimes referred to as the "HCBE Defendants") argue that Plaintiff's Complaint fails to demonstrate a constitutionally cognizable claim, an essential element of 42 U.S.C. § 1983.  (Mem. of Fact and Law in Support of Defs.' Balcerzak and Nordaas' Mot. to Dismiss 1st Am. Compl. ["B&N's Mem."] 10-11.)  The HCBE Defendants argue that they have found no legal authority in any jurisdiction that a constitutional right to referendum exists.  (*Id.* 10.)  Thus, the argument goes, this Court must dismiss Count I as Kendall cannot show that Nordaas and/or Balcerzak deprived him of a right secured by the Constitution or laws of the United States.  (*Id.* 11.)  Similarly, the HCBE Defendants argue that Count II should be dismissed "as it mirrors the Complaint in Count I but asserts ostensibly different grounds under due process and equal protection clauses."  (*Id.*)

A.

Count I

Plaintiff styles Count I of his First Amended Complaint as "Violation of Protected Liberty Interests by [1] Denial of Right to Freely Associate[, 2] Denial of the Right to Petition the Government[, and 3] Denial of the Right to Vote . . . ."  (1st Am. Compl. at 11.)  Plaintiff also asserts in Count I that his First Amendment right to engage in "politically protected speech" has been violated.  (1st Am. Compl. ¶ 38.)

Balcerzak and Nordaas ask this Court to reject what they call "Kendall's strained interpretation and attempt to cast the referendum language of the Howard County Charter as a denial of his right to freely associate; petition the government; and deny him the right to vote." (B&N's Mem. 10.)  The HCBE Defendants argue that there is no constitutional right to referendum.  (*Id.*)  They have oversimplified the state of the law on this issue.

While the Constitution does not require a State to create an initiative procedure, if a State

6

does create such a procedure, the State cannot place restrictions on its use that violate the federal

Constitution. *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 295 (6th Cir.

1993). Here, the State of Maryland has conferred upon the citizens of charter counties, of which

Howard County is one, *Howard County v. JJM, Inc.*, 482 A.2d 908, 909 (Md. 1984), the right to

reserve unto themselves by express charter provision the power to refer legislation enacted by the

County Council. *Ritchmount P'ship v. Bd. of Supervisors of Elections for Anne Arundel County*,

388 A.2d 523, 533 (Md. 1978) (*citing* Md. Const. Art. XI-A, § 1). As previously discussed, the

citizens of the County have reserved to themselves the power to petition to referendum "any law

or part of any law of the Council." Howard County, Md., Charter § 211 (2008).

Once the right of referendum has been created, the exercise of that right is protected by

the First Amendment applied to the States through the Fourteenth Amendment. *Stone v. City of

Prescott*, 173 F.3d 1172, 1175 (9th Cir. 1999). "Thus, a State may not impermissibly burden the

exercise of the right to petition the government by initiative or referendum. That holds true even

if the burden is imposed by the State Constitution itself." *Id.* Notably, it is the *exercise* of the

right that is protected. There is no fundamental right to initiate legislation as there is a

fundamental right to vote. *See Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210-11 (10th

Cir. 2002); *Hoyle v. Priest*, 265 F.3d 699, 702 (8th Cir. 2001); *Taxpayers United for Assessment

Cuts v. Austin*, 994 F.2d 291, 295 (6th Cir. 1993); *Kelly v. Macon-Bibb County Bd. of Elections*,

608 F. Supp. 1036, 1038-39 (M.D. Ga. 1985).

In assessing Plaintiffs' claims, I find particularly instructive the analysis of the Sixth

Circuit in *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291 (6th Cir. 1993). In that

case, voters whose initiative petition was denied certification for submission after a large number

of signatures was disqualified by the Board of State Canvassers due to statutory deficiencies filed

an action under 42 U.S.C. § 1983 alleging that the state had deprived them of their First and Fourteenth Amendment rights. *Id.* at 293-94. The court first addressed the plaintiffs' contention that Michigan's procedures denied them the right to vote by excluding the signatures of some registered voters only because "technical checks" showed a failure to comply with Michigan initiative law.[3] *Id.* at 296. The court concluded that the plaintiffs had not demonstrated a violation of the right to vote as the court could identify no decision of the Supreme Court or a lower federal court holding that signing a petition to initiate legislation is entitled to the same protection as exercising the right to vote. *Id.*

The court then concluded that the plaintiffs' rights to free speech and political association also had not been violated. "Because the right to initiate legislation is a wholly state-created right, we believe that the state may constitutionally place nondiscriminatory, content-neutral limitations of the plaintiffs' ability to initiate legislation." *Id.* at 297. The court found that the challenged Michigan procedure "does nothing more than impose nondiscriminatory, content-neutral restrictions on the plaintiffs' ability to use the initiative procedure that serve Michigan's interest in maintaining the integrity of its process." *Id.*

Similarly, here, and for the same reasons cited by the *Austin* court, Plaintiff has not demonstrated a violation of the right to vote.[4] As for Plaintiff's claims that his right to engage in

---

[3]  An example of a signature eliminated by the procedures was a signature which was not accompanied, as required, by the signer's complete home address. *Taxpayers United for Assessment Cuts*, 994 F.2d at 293.

[4]  I realize that at least one court has concluded that state regulations on the initiative and referendum process "implicate the fundamental right to vote." *Lemons v. Bradbury*, 538 F.3d 1098, 1102 (9th Cir. 2008). There, the Ninth Circuit reasoned that both the initiative and referendum powers serve as "basic instruments of democratic government," so both implicated the plaintiffs' fundamental right to vote. *Id.* at 1103 (citations omitted). The court proceeded to find that the regulations at issue would not be subjected to strict scrutiny, even though they implicated a fundamental right. *Id.* ("[S]trict scrutiny applies only when the right to vote is 'subjected to severe restrictions.' However, 'when a state election law provision imposes only

politically protected speech, right to petition, and right to associate were denied, I must

determine whether the challenged statute, as applied to Plaintiff, imposes anything other than

"nondiscriminatory, content-neutral limitations" on Plaintiff's right of referendum.  Section 6-

203 of Maryland election law, which governs the process of signing a referendum petition and

validating signatures on a referendum petition provides, in pertinent part:

> (a) Generally – To sign a petition, an individual *shall*:
>   (1) sign the individual's name as it appears on the statewide voter registration list
>       or the individual's surname of registration and at least one full given name
>       and the initials of any other names; and
>   (2) include the following information, printed or typed, in the spaces provided:
>       (i)      the signer's name as it was signed;
>       (ii)     the signer's address;
>       (iii)    the date of signing; and
>       (iv)     other information required by regulations adopted by the State Board.
> (b) Validation and counting – The signature of an individual shall be validated and
> counted if:
>   (1) the *requirements* of subsection (a) of this section have been satisfied; . . . .

Md. Code, Elec. Law § 6-203 (2008) (emphasis added).  In *Doe*, the Maryland Court of Appeals

found that the plain meaning of the words "shall" and "requirements" in Section 6-203 indicated

that the statutory provisions "<u>require</u> that the voter <u>must</u> sign his or her name as it appears on the

---

reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of
voters, the State's important regulatory interests are generally sufficient to justify the
restrictions.'" (*quoting Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).

    I do not find the reasoning of the *Lemons* court persuasive.  I am more persuaded by the
reasoning of an earlier Ninth Circuit case, *Stone v. City of Prescott*, 173 F.3d 1172 (9th Cir.
1999), in which the court analyzed two Supreme Court cases addressing First Amendment rights
in the context of referenda, *Meyer v. Grant*, 486 U.S. 414 (1988) and *Buckley v. American Const.
Law Found., Inc.*, 525 U.S. 182 (1999), and reasoned:

> Those cases teach that where the people reserve the initiative or referendum
> power, the *exercise* of that power is protected by the First Amendment applied to
> the States through the Fourteenth Amendment.  Thus, a State may not
> impermissibly burden the *exercise* of the right to petition the government by
> initiative or referendum.

*Stone*, 173 F.3d at 1175 (emphasis added).  *Meyer* and *Buckley* held that the First Amendment
protects political speech incident to an initiative campaign, *Buckley*, 525 U.S. at 194-95; *Meyer*,
486 U.S. at 421-23 because it protects the *exercise* of the state-created right of referendum.  The
state-created right is not, however, in and of itself a fundamental right.

statewide voter registration lists or the individual's surname of registration and at least one full given name and the initials of any other names; the provisions are mandatory, not suggestive." 962 A.2d at 360 (citation and internal quotations omitted) (emphasis in original).  The Court explained that the purpose of such signature requirements and the subsequent validation process, "relating to whether the signature is sufficient, is to 'provide additional means by which fraudulent or otherwise improper signatures upon a referendum petition may be detected.'"  *Id.* at 362-63 (*quoting Barnes v. State ex rel. Pinkney*, 204 A.2d 787, 793 (Md. 1964)).

I find that Section 6-203, as interpreted by the Maryland Court of Appeals, is, in fact, non-discriminatory and content-neutral.  Effectively, the statute requires that the signer of a petition sign his full name (whether first name and middle initial or first initial and middle name) in order for his signature to be validated.  Such a requirement is applied indiscriminately to all petition signers.  And, as discussed by the *Doe* court, the validation process mandated by the statute is reasonably related to the purpose of detecting fraudulent or otherwise improper signatures.  It imposes no "impermissibl[e] burden" on Plaintiff's exercise of the state-created right of referendum.

Thus, I conclude that the HCBE Defendants' application of Section 6-203 did not violate Plaintiff's First Amendment rights.

However, I note that Plaintiff alleges that HCBE did not, in fact, apply Section 6-203 as written but rather "thr[ew] out [individuals' signatures] because they were not exactly as written on their voter registration card[s]."  (1st Am. Compl. ¶ 58.)  There is no indication that is so.  Balcerzak and Nordaas assert that HCBE's second review of the signatures on the HCCOG petition utilized the validation procedures set forth in Section 6-203 (B&N's Mem. 4, 6), and Nordaas said as much in the final determination letter issued to HCCOG's counsel.  (1st Am.

Compl., Ex. H ("Counsel to the Howard County Board of Elections studied [the *Doe*] opinion and advised the Board of Elections that a reassessment of the initial submission was necessary and appropriate based upon the clear principles and guidelines as outlined [therein].").)  The final determination letter further stated that HCBE requested revised guidelines from MSBE (and MSBE had in turn requested guidance from the Attorney General's office) to ensure that the guidelines would be in agreement with *Doe*.  (*Id.*)

Plaintiff has not alleged more than "the mere possibility" that the HCBE Defendants used a validation procedure other than that required by Section 6-203.  *Iqbal*, 129 S. Ct. at 1950. Consequently, I find that Plaintiff has not shown that he is entitled to relief under that theory.

Count II

Count II of the First Amended Complaint contains Plaintiff's allegations that he was denied equal protection as well as substantive and procedural due process in violation of the Fourteenth Amendment to the United States Constitution.

a.

Plaintiff has not demonstrated that the HCBE Defendants have violated his right to equal protection.  Ordinarily, when a state regulation or policy is challenged under the Equal Protection Clause, unless it involves a fundamental right or a suspect class, it is presumed to be valid and will be sustained "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Veney v. Wyche*, 293 F.3d 726, 731 (4th Cir. 2002) (quoting *Heller v. Doe*, 509 U.S. 312, 319-320 (1993)).  Although Defendants' application of Section 6-203 to Plaintiff's signature (and others) on the HCCOG petition did distinguish between individuals whose signatures were thrown out because they did not meet the requirements of Section 6-203 and those whose signatures were accepted because they did meet said

requirements, Plaintiff has not demonstrated that he, as a result of being an individual whose

signature was not in compliance, was a member of a suspect class.  And having determined that

Plaintiff has had no right infringed under a First Amendment analysis (as discussed in Part A.1.),

I need not conduct a separate inquiry under a fundamental rights analysis of equal protection.

*Hoffman v. State of Md.*, 928 F.2d 646, 649 (4th Cir. 1991) (citation omitted).  Thus, Defendants'

actions in applying Section 6-203 to Plaintiff's signature are valid in that there is a rational

relationship between separating those signatures which meet Section 6-203's requirements from

those which do not and the legitimate governmental purpose of detecting fraudulent or otherwise

improper signatures upon a referendum petition.

### b.

Plaintiff's claim that his substantive due process rights have been violated also fails.  The

Fourth Circuit has noted that "while liberty interests entitled to procedural due process protection

may be created by state law as well as the Constitution itself, those entitled to substantive due

process protection (whatever the procedures afforded) are 'created only by the Constitution.'"

*Hawkins v. Freeman*, 195 F.3d 732, 748 (4th Cir. 1999) (*quoting Regents of Univ. of Mich. v.*

*Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring)).  As discussed above, the HCBE

Defendants' application of Section 6-203 to Plaintiff's signature and others on the HCCOG

petition did not violate a fundamental right of Plaintiff's, created by the federal Constitution.  As

Plaintiff "has identified no substantive constitutional right violated by the Defendants, . . . [he]

thus cannot claim the freedom from arbitrary state action which such a right generates."  *Judd v.*

*City of Harrisonburg*, No. 92-2513, 1994 WL 548852, 37 F.3d 1494, at *2 (4th Cir. 1994)

(Table). I thus find that Plaintiff fails to state a claim that his right to substantive due process has

been violated.

c.

In order for Plaintiff to succeed on his procedural due process claim, he must show "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009) (internal quotations omitted).  Here, Plaintiff does possess a state-created right to petition legislation to referendum, and that right was deprived when the HCBE Defendants invalidated his signature on the HCCOG petition.  The question, then, is whether the procedures employed by HCBE were constitutionally inadequate.  Procedural due process provides merely "a guarantee of fair procedures – typically notice and an opportunity to be heard." *Wolf v. Fauquier County Bd. of Supervisors*, 555 F.3d 311, 323 (4th Cir. 2009) (citations omitted).  As the Supreme Court has recognized, "'[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Rusu v. U.S. I.N.S.*, 296 F.3d 316, 321 (4th Cir. 2002) (*quoting Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).  "[W]hat constitutes being heard at 'a meaningful time and in a meaningful manner' will have different meanings in different circumstances, and due process only 'calls for such procedural protections as the particular situation demands.'" *Id*. (*quoting Mathews*, 424 U.S. at 334).

Here, Plaintiff challenges the procedures employed by HCBE in re-verifying the 2,603 signatures on the HCCOG petition which had been initially validated and certified on January 22, 2009.  Plaintiff cites an e-mail sent on the evening of March 11, 2009 to several persons involved in the referendum process stating that HCBE "desires you to be present tomorrow evening at 5:30 PM at its meeting." (1st Am. Compl. ¶ 22; *id.*, Ex. G.)  At the meeting on March 12, 2009, Balcerzak stated that HCBE was reversing its January 22, 2009 decision certifying the

13

first 2,603 signatures.  (*Id.* ¶ 22.)  Nordaas explained that HCBE found, after review of each

signature on the petition, that it had not validated each signature in accordance with the mandate

set forth in *Doe*, and that upon advice from the Attorney General's office, HCBE re-verified and

validated the signatures on the petition submitted on December 30, 2008, and found that the total

number of signatures fell below the 2,500 signatures necessary to qualify HCCOG for a thirty-

day extension to secure an additional signatures.  (*Id.*, Ex. H.)

> The letter further explained:

> The Board of Elections has requested revised guidelines from the State Board of
> Elections, reference COMAR Title 33.06.05.02(A), in order to complete an
> additional detailed review of each signature on the Local Referendum Petitions.
> The State Board of Elections has contacted the Attorney General's office in order
> to ensure the guidelines will be in agreement with the December 19, 2008 ***DOE***
> opinion and is in the process of preparing the revised guidelines for Local Boards
> to use.

(*Id.*, Ex. H.)  According to the HCBE Defendants, this written decision was presented at the

meeting where members of HCCOG spoke and the decision of the Board was explained.

(B&N's Mem. 7.)

> HCBE's actions appear to have complied with the notice requirements of Maryland

election law.  Maryland statute provides that once the local election authority has verified and

counted the signatures submitted on a petition for referendum, the chief election official shall:

> (1) determine whether the validated signatures contained in the petition are
> sufficient to satisfy all requirements established by law relating to the number and
> geographical distribution of signatures; and (2) . . . determine whether the petition
> has satisfied all other requirements established by law for that petition and
> immediately notify the sponsor of that determination, including any specific
> deficiencies found.

Md. Code, Elec. Law § 6-208(a).  State law further provides that within two business days of a

determination that a petition is deficient, the chief election official of the election authority must

notify the petition's sponsor of the determination.  Md. Code, Elec. Law § 6-210(b).  In this case,

it appears that members of the HCCOG received notice of HCBE's final determination regarding HCCOG's petition on March 12, 2009, the same date as that provided on the written decision.

Maryland law does not require, nor did HCBE provide, notice to anyone associated with HCCOG that it was considering invalidating signatures on the HCCOG petition prior to making that determination.  But the fact that HCBE failed to provide notice to Kendall that his signature was being invalidated does not give rise to a due process violation.  As the Seventh Circuit reasoned in *Protect Marriage Illinois v. Orr*, 463 F.3d 604, 608 (7th Cir. 2006):

> [W]hat is required in the name of due process depends, as the Supreme Court made clear in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), on the costs as well as the benefits of process.  The cost of allowing tens of thousands of people to demand a hearing on the validity of their signatures would be disproportionate to the benefits, which would be slight because the state allows the organization orchestrating a campaign to put an advisory question on the ballot, in this case Protect Marriage Illinois, to challenge the disqualification of any petitions.  Nor is it clear to us what right of liberty or property (an essential predicate of a due process claim) the plaintiffs have been deprived of by being required to comply with the requirements of state law.

(citations omitted).

In this case, as in *Protect Marriage Illinois*, I find that the costs of allowing thousands of people to demand a hearing on the validity of their signatures would be disproportionate to the benefits, given that the state provides a procedure by which "a person aggrieved by a determination" that a petition is deficient may seek judicial review in the circuit court for the county in which the petition is filed.  Md. Code, Elec. Law § 6-209(a)(1).

Apparently, HCCOG timely filed a Petition for Judicial Review of HCBE's final determination in the Circuit Court for Howard County seeking, in part, a declaratory judgment that the final determination be declared invalid.  (B&N's Mem. 7.)  Kendall, along with two other individuals, also filed a Complaint for Declaratory Judgment and Other Appropriate Relief in the Circuit Court for Howard County.  (Pl.'s Opp'n to Def.'s Mot. to Dismiss ["Pl.'s Opp'n"]

15; B&N's Mem. 7.)  According to Plaintiff, that case was unrelated to this one, and Plaintiff voluntarily dismissed that state court action after HCBE filed a motion to dismiss.  (Pl.'s Opp'n 15.)

Nonetheless, Plaintiff could have filed a challenge to HCBE's final determination in state court, and he should have done so.[5]  As the Maryland Court of Appeals noted in its analysis of Section 6-209 in *Doe*, a registered voter may bring the action for judicial review when a determination is made that results in aggrievement.  962 A.2d at 353.   To be "aggrieved" for purposes of judicial review, a person ordinarily "must have an interest such that he is personally and specifically affected in a way different from . . . the public generally."  *Id.*  (citations and internal quotations omitted).  As Plaintiff signed the HCCOG petition, and as his signature was, he claims, invalidated by HCBE's final determination, he would be considered "a person aggrieved by [the] determination" that HCCOG's petition was deficient under Section 6-209, and accordingly, he could have sought state court review of HCBE's determination.  There was adequate process available to provide Plaintiff "an opportunity to be heard."  "[A] procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 423 (3d Cir. 2008) (alteration in original, citation omitted).

I thus find that there is no violation of Plaintiff's right to procedural due process.

### B.

Balcerzak and Nordaas also argue that Plaintiff's Complaint must be dismissed as

---

[5]      I note that Maryland Election law requires that "any judicial review of a determination . . . be sought by the 10th day following the determination to which it relates."  Md. Code, Elec. Law § 6-210(e)(1).

Plaintiff's claims are barred by the qualified immunity doctrine.  I find that qualified immunity does not apply here.

"Qualified immunity may be invoked by a government official sued in his personal, or individual, capacity.  This defense is not available in an official-capacity suit brought against a government entity or a government officer as that entity's agent."  *Ridpath v. Board of Governors Marshall University*, 447 F.3d 292, 306 (4th Cir. 2006) (*citing Kentucky v. Graham*, 473 U.S. 159, 165-67 (1985)).  As Plaintiff notes, he has sued the HCBE Defendants not in their personal or individual capacities, but in their official capacity (Pl.'s Opp'n 15; 1st Am. Compl. ¶¶ 5, 6), so the defense of qualified immunity is not available.

IV. Defendant Howard County's Motion to Dismiss

Defendant Howard County ("the County") seeks dismissal of all claims asserted against it on the basis that Kendall has failed to allege "that the County has taken any action with respect to HCCOG's referendum petition, let alone any action that violates Kendall's constitutional rights."  (Mem. of Law in Supp. of Def. Howard County's Mot. to Dismiss Am. Compl. ["Def. Howard County's Mem."] 2.)  The County argues that, as a matter of law, it could not have taken any action with respect to HCCOG's petition, as HCBE and its officials are State agents, not agents of the County.  (*Id.*)  Moreover, HCBE did not implement any County custom or policy with respect to HCCOG's petition, but instead implemented State law.  (*Id.*)  The argument is well founded, and the County's motion will be granted.

A separate order effecting the rulings made in this memorandum is being entered herewith.

17

DATE:   10/19/2009                    /s/
                                      J. Frederick Motz
                                      United States District Judge